IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 9, 2020

**STATE OF TENNESSEE v. JOHN M. BANKS**

**Appeal from the Circuit Court for Montgomery County**
**No. CC17-CR-925  William R. Goodman, III, Judge**

_____

**No. M2019-00017-CCA-R3-CD**

_____

Defendant, John M. Banks, was convicted of aggravated burglary (Count One), possession of a firearm during the commission of a dangerous felony (Count Two), especially aggravated robbery (Count Three), and two counts of aggravated robbery (Counts Four and Five).  The trial court imposed concurrent sentences of four years for aggravated burglary, eighteen years for especially aggravated robbery, and eight years for each count of aggravated robbery to run consecutively to a six-year sentence for possession of a firearm during the commission of a dangerous felony, for an effective twenty-four-year sentence. On appeal, Defendant argues that the evidence was insufficient to support his two convictions for aggravated robbery, that the trial court erred by denying his motion to suppress his statement, and that the trial court erred in sentencing him to eighteen years for his especially aggravated robbery conviction.  Upon reviewing the record and applicable law, we reverse Defendant's conviction for aggravated robbery in Count Five and affirm the remaining convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed in Part and Reversed in Part**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal) and Taylor R. Dahl, Clarksville, Tennessee (at trial) for the appellant, John M. Banks.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Daniel Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Background

*Suppression Hearing*

The twenty-year-old Defendant testified that this case was the first time that he had been arrested and held on a serious charge. He was arrested in Utah for the present offenses and returned to Tennessee. Defendant claimed that he was in Utah on vacation at the time. Defendant testified that he was interviewed by Detective Carlton the morning after his arrest. At that point, he did not know the nature of the charges against him. He said that his mother had hired an attorney to represent him. Defendant testified that Detective Carlton asked him to sign a waiver form, but Defendant said that he did not understand the form, and Detective Carlton never explained it to him. He admitted that Detective Carlton read the form to him. Defendant testified that he did not graduate from high school or obtain his GED. Defendant said that he told Detective Carlton that he had a lawyer, but Detective Carlton did not respond. When asked why he signed the waiver of rights form, Defendant replied: "Because I thought when I told him I had a lawyer that it would be over with." He also thought that his attorney would be present for the interview. Defendant said that he did not intend to waive his rights, and he did not understand the consequences of waiving his rights. He also did not understand that his statement would later on be used against him.

On cross-examination, Defendant admitted that he had been charged and convicted of a crime in the past. However, he claimed that he was not familiar with the criminal justice system. Defendant testified that he had watched parts of the interview and that it did not represent what actually took place.

Detective Keenan Carlton of the Clarksville Police Department testified that he advised Defendant of his *Miranda* rights before interviewing him. He specifically advised Defendant that he had the right to have an attorney present, and Defendant did not unequivocally say that he wanted an attorney present. Detective Carlton testified that Defendant indicated that he had an attorney and asked what would happen. Detective Carlton said that he replied, "it works however you would like for it to work." He testified that Defendant then continued talking to him. Detective Carlton asserted that Defendant initially began asking him questions, and he proceeded at some point to ask Defendant questions.

On cross-examination, Detective Carlton testified that Defendant did not express any confusion about the waiver of rights form. He did not recall if Defendant asked how the form worked. Detective Carlton agreed that Defendant said that he was supposed to talk with his attorney first, but the police arrived before his attorney. He further agreed

that Defendant shook his head no when he asked if Defendant wanted to continue with the interview. However, Defendant asked a question after that.

*Trial*

Officer Kevin Westover of the Clarksville Police Department testified that at approximately 11:31 p.m. on October 3, 2016, he responded to a home invasion call at 2162 Blakemore Drive. He stopped approximately two to three houses from the residence and turned off his emergency lights and sirens in order to avoid detection by the suspects. Officer Westover and Officer George Goodman approached the house and saw that the front door was ajar, and they could see inside the home. They also encountered a man who said that he had been shot. Officers Westover and Goodman conducted a protective sweep of the home and spoke with other individuals in the residence. One of the individuals said that there were three suspects who left out the side door. The house looked as if it had been ransacked. Officer Joshua Godwin also arrived at the scene. He saw a dark colored four-door vehicle parked three or four houses down from 2162 Blakemore Drive. Officer Jennifer Renken testified that she found a set of keys on a pallet outside in the backyard. A revolver was also found behind a fence in the backyard.

Regina Hayes, a resident of Blakemore Drive, testified that she has a security system and observed a car driving "back-and-forth" down the road on October 3, 2016. The car stopped at her neighbor's house and parked under the street light. Ms. Hayes testified that she saw four individuals exit the car wearing hoodies, and they walked past her house to another house. She did not recognize any of the individuals. Ms. Hayes called police, and she gave them a copy of the surveillance video.

Demarkus Brown testified that he was at Antonio Atkins' residence on October 3, 2016, along with Towanna Atkins, Shaunon Hill, Dasian Hill, and two children, ages nine and three. Sometime after 11:00 p.m., Mr. Brown was lying on the couch when he heard something at the front door. He said that Ms. Atkins was outside smoking, and everyone else was in bed. Mr. Brown stood up and heard additional noises. The door opened, and he heard someone order him to get down. He was then shot in the stomach. Mr. Brown testified that three men came into the residence and began rummaging through everything and flipping the couches. Mr. Brown remembered that the men were wearing ski masks, and some of them were dressed in black. He noted that one of the men was wearing an orange ski mask. Mr. Brown testified that the men asked him where the money and Mr. Atkins were located. He further testified that two of the men, who were armed, stood over him and one said, "Give me everything you got in your pockets." The two men took Mr. Brown's cell phone and his wallet containing forty dollars. Mr. Brown testified that the three men left the residence through the side door when police sirens were heard. He did not know any of the individuals.

- 3 -

Mr. Brown was taken to Vanderbilt Medical Center after the shooting, where he remained for three months and underwent significant medical treatment because his injuries were life threatening. He had to wear a colostomy bag for a period of time. He testified the bullet is still lodged in his spine and cannot be removed, because he faces a fifty-percent chance of paralysis if he were to undergo a procedure to remove the bullet. Mr. Brown has continued to experience daily problems as a result of his injuries.

Towanna Atkins, Antonio Atkins' sister, testified that she was walking into the kitchen when the three individuals broke into Mr. Atkins' house. She said, "I heard a boom and a popping sound, and I just heard everybody start saying, 'Get on the ground.'" Ms. Atkins testified that a man with a gun who "had something over his head and [ ] something red covering his face" came into the kitchen and held the gun to her head and ordered her to get down on the kitchen floor. She saw a total of three men in the residence, and one of them was approximately five feet nine inches tall, wearing a hoodie and had something covering his face. The two other men also had masks covering their faces. Ms. Atkins heard one of the men ask Mr. Brown "[w]here's A.K." and "[w]here's the money?" Another man asked if there were any shoes in his size. Ms. Atkins testified that the men ran past her to the side door, and someone said: "They're coming" or "Are they outside." She said that her keys and cell phone were taken from the table, and the men placed clothing, shoes, and other things from the closets into garbage bags. Ms. Atkins did not recognize the men.

After the three men left the house through the side door, Mr. Brown told Ms. Atkins that he had been shot. By the time that she got into the living room with a towel, the police had arrived. Ms. Brown noted that everything was pulled out of the closet next to the front door, and the living room was a "complete mess." She testified that everything was also pulled out of the hallway closet, and the first bedroom, where Ms. Shaunon Hill slept, was also ransacked. The bathroom was also a mess.

Shaunon Hill testified that on the night of the shooting, she was in bed playing a game on her phone when she heard a "big loud boom" sometime between 10:30 and 11:00 p.m. She then heard a gunshot and someone say, "Get down. Get down. We [sic] looking for money." Ms. Shaunon Hill thought that she heard two voices. She testified that two men came into her bedroom, and she saw two additional men in the hallway. Ms. Shaunon Hill remembered that the men had their heads covered with a hat or scarf, and their faces were covered. One of the men, who was wearing gloves, pointed a gun at her forehead and ordered her to get on the floor. Ms. Shaunon Hill testified that the second man who entered the room had a scarf on his face and ransacked the room asking her where the money was located. She told the men "[t]his is nana's room. There's no money in here." Ms. Shaunon Hill testified that she was very frightened. She said that one of the men in the hallway also had a gun and was rummaging through the closet outside of her door. Ms. Shaunon Hill testified that one of the men asked her what was at the back of the house, and she informed the man that her grandchildren were back there

- 4 -

and that he was not "going to go mess with them." The man agreed not to bother the children, and Ms. Shaunon Hill told them to "get what you going to get and get out." She said that the men began gathering white trash bags that they had filled with shoes and other items from the house. Ms. Shaunon Hill testified that the men did not take anything from her, and she called 911 after they left the room and ran out of the house. While she was on the phone, Mr. Brown told her that he had been shot. Ms. Shaunon Hill did not recognize any of the men who entered the house.

Ms. Dasian Hill testified that she was living with Antonio Atkins on October 3, 2016. She and Mr. Atkins were in bed when she was awakened by a "kick on the door" and a gunshot. Ms. Dasian Hill walked out of the bedroom and saw two black males wearing face coverings entering the house through the front door. She remembered seeing an orange bandanna and a black face mask. One of the men had "twists" in his hair. Ms. Dasian Hill ran back into the bedroom, called 911, woke Mr. Atkins, and got into the closet while remaining on the line with the dispatcher until police arrived. Ms. Dasian Hill testified that the men attempted at some point to enter the bedroom but she and Mr. Atkins held the door closed by pushing a dresser against the door. Ms. Dasian Hill heard the men repeatedly shouting, "Where the money at? Where he at?" She did not recognize either of the men in the house.

Antonio Atkins testified that he was also awakened by a loud boom, and someone kicking in the front door. Ms. Dasian Hill then ran into the bedroom and said that someone was trying to break-in the house. Mr. Atkins shut the door, and held it shut. A few seconds later he heard a gunshot. Mr. Atkins did not have any contact with the men who entered the house. He noted that the clothing, shoes, and car keys taken from the residence belonged to him. Most of his belongings were later recovered.

Officer Gary Mefford of the Clarksville Police Department testified that he and his K-9 partner, Leo, responded to the home invasion on Blakemore Drive. Officer Mefford was advised of the direction in which the suspects fled by other officers on the scene. Leo led Officer Mefford to a chain link fence in the backyard where there were some pallets with glass stacked on top of them. Officer Medford testified that Leo "began to nose at the pallets," and Officer Mefford discovered two sets of keys. Leo then attempted to go through the bottom of the chain link fence, and Officer Mefford discovered a revolver on the other side of the fence. Officer Mefford testified that he moved Leo to the other side of the fence, and the dog continued tracking to the gate leading to the front yard where Officer Mefford discovered a blaze orange ski mask. Leo continued to track down the street from where the mask was located, parallel to Briarwood Drive. Officer Mefford and Leo reached the corner residence, and Leo "nosed" on a Nike shoebox on the ground. Leo continued tracking and traveled into the direction of the suspects' car and back toward the victim's house.

Leo eventually led Officer Mefford to a hill where Leo retrieved a t-shirt. Officer Mefford took the shirt and placed it back on the ground. Leo then made a left turn and traveled into the woods where he located a baseball cap lying on the ground. Officer Mefford and Leo continued down a path and through a creek bed and a couple of fences. They turned right, adjacent to Whitfield Road, and went through the woods. Leo slowed down and lifted his head, which indicated that he sensed "fresh human odor [that] is foreign to the terrain." Officer Mefford testified that Leo began to circle and pulled to the left where he located a pair of tennis shoes. At that point, Leo was exhausted, and Officer Mefford returned to the scene to give Leo water and allow him to rest. All of the items found by Leo were collected by other officers. Officer J.T. Knoblock of the Clarksville Police Department testified that he had the suspects' vehicle transported to the police department's evidence lot.

At the time of the offenses, Julian Mize lived in a house on Briarwood Drive that was located directly behind a house on Blakemore Drive. He noted that the backyard of the two homes shared the same fence and that Briarwood Drive was a loop that ran parallel to Blakemore Drive where the victims' house was located. At some point after October 3, 2016, Mr. Mize found a cellular phone under the fence in the corner of his and his neighbor's yard. He eventually took the phone to the Clarksville Police Department and gave it to an officer.

Kevonte White was twenty-years-old at the time of trial, and he had known Defendant since before they were in high school. He agreed that he pled guilty to three counts of aggravated robbery and was serving his sentence for the crimes at issue in this case. Mr. White testified that he and two other individuals went to Antonio Atkins' residence on the October 3, 2016, because the victim owed him some money. He said that they rode to the house in a black, four-door sedan but he did not know who owned the car. Mr. White testified that he kicked the door in and entered the house. He could not remember if anyone else entered the house. Mr. White testified that there was a gunshot but he did not know who fired the shot. He claimed that he could not really remember the events of what happened that night. Mr. White testified that he knew someone called "Rico" but he did not know if the person's name was actually Brandon Berry.

Detective Carlton testified that the two sets of keys found on the stack of pallets behind the victims' residence belonged to Antonio Atkins and Towanna Atkins. The cell phone found by Mr. Mize also belonged to Ms. Atkins, and Detective Carlton returned it to her. Detective Carlton testified that the .38 caliber revolver found on the other side of the fence behind the house was loaded. He retrieved the surveillance video from the victims' neighbor, Regina Hayes, which showed the suspects' vehicle drive past her house and stop. The car was later found down the street by police. There were also four individuals seen on the video.

Detective Carlton testified that the car was registered to Brandon Berry, a.k.a. "Rico." Detective Carlton searched the vehicle and interviewed Mr. Berry. He collected a blue and orange stocking cap, a cell phone, and a Powerade bottle from the vehicle. The cell phone belonged to Defendant but was registered to Defendant's mother. Detective Carlton obtained a warrant and searched the contents of the phone. He said that there were several "selfie videos" on the phone of Defendant rapping while wearing an orange cap. The videos were recorded a few hours before the robbery.

Detective Carlton interviewed Defendant on March 13, 2017. Defendant identified his co-defendants: Kamari Wilson, Damari Moore, and Kevonte White from photographs that Detective Carlton showed him. Detective Carlton testified that Defendant admitted to going to the victims' residence and possessing the gun that was found in the backyard. Defendant told Detective Carlton that he and the other individuals went to the victims' residence to get money from Antonio Atkins. There was also talk during the interview about a pair of Nike "Yeezy" shoes that was dropped by Ms. Wilson. Detective Carlton noted that a pair of Yeezy shoes was found in some nearby woods after the robbery. Defendant said during the interview that Mr. Wilson told Defendant that he had lost his shoes. Detective Carlton testified that he took a buccal swab from Defendant for DNA comparison.

The transcript of the Defendant's interview with Detective Carlton was introduced as an exhibit at trial. During the interview, Defendant stated that Mr. White and a man from Detroit called and asked Defendant to do something, and Defendant agreed. The victim owed the man from Detroit some money. Defendant admitted that he, Mr. White, Mr. Wilson, and Mr. Moore pulled up to a house, and "it happened." He said that Mr. Moore fired the first shot, and he could not recall who kicked in the door. Defendant claimed that he stood at the front door and did not touch anything. He denied having a shotgun but admitted that he had a .38 caliber gun. Defendant said that Mr. Moore had a .22 caliber weapon or another small gun. He also said that one of his accomplices took eighty dollars from the woman in the kitchen and one-hundred twenty dollars from the man who was shot. Defendant denied that he was wearing an orange mask during the robbery but recalled that he was wearing a black hood. He said that he saw police arrive on the scene with their lights off. Defendant said that he jumped the fence without the gun because he feared shooting himself. He admitted that Mr. Moore yelled out Defendant's and Mr. White's names. Defendant said that he and his co-defendants split up to flee the scene.

Dr. Christina Wells is employed by the Tennessee Bureau of Investigation (TBI) Forensic Biology Unit and is an expert in serology and DNA identification. She examined the orange mask located at the scene in this case. Dr. Wells testified that the DNA profile obtained from a stained area on the mask was "consistent with a mixture of at least four individuals, including at least one male." She further testified that "[d]ue to the limited profile obtained and an unknown number of potential contributors to the

profile, interpretation was inconclusive for the stained area." Dr. Wells testified that the DNA profile obtained from the area of the mask around the eyes, nose, and mouth was also consistent with a mixture of at least four individuals, and the "major contributor profile" of DNA matched that of Defendant. The minor contributor profile was inconclusive.

On cross-examination, Dr. Wells testified that she also tested a revolver. The results of DNA on the weapon revealed a mixture of at least four individuals as well. An unknown male was the major contributor of the DNA on the weapon.

*Analysis*

## I.      Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to sustain his convictions for the aggravated robbery of Towanna Atkins (Count Four) and Shaunon Hill (Count Five).

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with

guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant to this case, aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and is accomplished with a deadly weapon. T.C.A. § 39-13-401 and § 39-13-402(a)(1). A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. *Id.* § 39-14-103(a).

First, as to the aggravated robbery of Towanna Atkins in Count Four of the indictment, most of Defendant's argument is Defendant's assertion that there is a fatal variance between the indictment and the proof at trial. Defendant contends that the indictment charged him with taking a cell phone, keys and eighty dollars in currency from Ms. Atkins; however at trial, Ms. Atkins testified only that keys, a cell phone, clothing, shoes, and "stuff like that" were taken during the robbery. He argues that there was "no testimony that the home invaders took any U.S. currency from Ms. Atkins."

"A variance between an indictment . . . and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984); *State v. Ealey*, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997)). Any variance between an indictment and the proof presented at trial "is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Moss*, 662 S.W.2d at 592.

"Unless a defendant can show that he has suffered a substantial deprivation of his rights, he is not prejudiced. If the indictment sufficiently informs him of the charges against him and will protect him from future prosecutions for the same offense, any variances are harmless." *State v. West*, 737 S.W.2d 790, 793 (Tenn. Crim. App. 1987) (citing *State v. Hardin*, 691 S.W.2d 578 (Tenn. Crim. App. 1985)).

There was no fatal variance between the indictment and the proof in this case as the proof substantially corresponded to the indictment and did not mislead Defendant at trial. Ms. Atkins testified that she was in the kitchen when the assailants broke into the house and pointed a gun at her while ordering her to the floor. She testified that the men took her keys, cell phone, and other items. Defendant himself admitted to Detective Carlton that one of his accomplices took eighty dollars from the woman in the kitchen, who was Ms. Atkins. The information contained in the indictment was sufficient to

provide Defendant with the notice of the charges against him, and the evidence was sufficient beyond a reasonable doubt to support Defendant's conviction for the aggravated robbery of Towanna Atkins. This issue is without merit.

Next, as to the aggravated robbery of Shaunon Hill in Count Five, Defendant argues that the evidence was insufficient to support this conviction because neither he nor his accomplices took any property from her or from her room. "A robbery can involve the taking of property from the physical body of a person, in which a person has actual possession of the property, or from a person's immediate presence or the general area in which the victim is located, in which the person has constructive possession of the property." *State v. Tolbert*, 507 S.W.3d 197, 217 (Tenn. Crim. App. 2016) (citations omitted); *see State v. Edmondson*, 231 S.W.3d 925, 928 (Tenn. 2007) ("The words 'from the person of another' indicate that the property is in close physical proximity to the victim when the property is taken."). "Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others. In essence, constructive possession is the ability to reduce an object to actual possession." *State v. Copeland*, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). "The mere presence of a person in an area where [an object is] discovered is not, alone, sufficient to support a finding that the person possessed the object." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).

In this case, Shaunon Hill testified she was in bed in her bedroom at Antonio Atkins' house when the home invasion occurred. Two men came into her room, and she saw two additional men in the hallway. One of the men pointed a gun at her forehead and ordered her to get on the floor. The other man ransacked the bedroom asking her where the money was located. Ms. Hill testified that one of the men in the hallway had a gun and was rummaging through the closet located outside of her bedroom door. She noted that the men began gathering trash bags that they filled with shoes and other items from the house. Ms. Hill specifically testified that the men did not take anything from her or her room. She said: [T]hey just was going through the closets, the drawers, slinging stuff on the floor. They lifted the mattress from the bed, the box spring. Like, as if they look - - really was looking for, you know, something." Mr. Atkins testified that the clothing and shoes taken from the house belonged to him. The evidence shows that although Ms. Hill was inside the house at the time of the home invasion, there is no proof that Ms. Hill had any interest in or right to the items taken by Defendant and his accomplices. Her "presence as a guest alone cannot establish that she had a greater right to possess the items than [Defendant]." *See State v. Christopher Shane Harrell*, No. E2005-01531-CCA-R3-CD, 2007 WL 595885, at *2, 11 (Tenn. Crim. App. Feb. 26, 2007); *William Boatwright v. State*, No. E2018-02185-CCA-R3-PC, 2020 WL 1166267, at *15-16 (Tenn. Crim. App. March 10, 2020). In its instructions to the jury, the trial court stated that to convict the defendant of the lesser included offense of Aggravated Assault, the essential element of serious bodily injury had to be proven beyond a

reasonable doubt. There is no evidence of any bodily injury to Shaunon Hill. Therefore, we reverse Defendant's conviction in its entirely as to Count Five, based upon insufficient evidence to support the conviction and dismiss that charge with prejudice.

## II. Denial of Motion to Suppress

Defendant contends that his statement should have been suppressed because it was made after he invoked his right to counsel.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect against compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. In *Miranda v. Arizona*, the United States Supreme Court established procedural safeguards to secure the Fifth Amendment privilege against self-incrimination. 384 U.S. 436, 444 (1966). To combat the compulsion inherent in a custodial interrogation, the accused must be informed prior to questioning regarding the right to remain silent, that anything he says can be used against him in a court of law, the right to an attorney, and that an attorney will be appointed at no cost prior to questioning upon request. *State v. Climer*, 400 S.W.3d 537, 557 (Tenn. 2013) (citing *Miranda*, 384 U.S. at 479). A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). The State bears the burden of proving by a preponderance of the evidence that the defendant waived his *Miranda* rights. *State v. Climer*, 400 S.W.3d 537, 564 (Tenn. 2013); *see also Missouri v. Seibert*, 542 U.S. 600, 608 n. 1, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). The State satisfies this burden if, based on the totality of the circumstances surrounding the interrogation, it shows that the waiver was voluntary in that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was knowing in that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986); *North*

*Carolina v. Butler*, 441 U.S. 369, 374-75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Colorado v. Spring*, 479 U.S. 564, 573, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987); *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010); *Climer*, 400 S.W.3d at 564-65.

When a suspect makes an unequivocal request for an attorney, all interrogation must cease unless the suspect initiates further conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The issue of whether a suspect's request for an attorney was unequivocal is a mixed question of law and fact that is subject to de novo review. *Climer*, 400 S.W.3d at 556. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," questioning need not cease nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

Concerning this issue, the trial court in this case made the following findings:

> In this case the Defendant after signing the *Miranda* warning, asked, "How does that work" to which the officer responded "it works however you want it to work." This Court finds that the execution of the *Miranda* warning serves as a knowing voluntarily waiver of the Defendant's right to counsel for purposes of the interview and that the interview which followed represents a statement made by the Defendant after a knowing and voluntary waiver of his right to counsel.

In this case, Defendant signed a waiver of rights form after being advised of his *Miranda* rights by Detective Carlton. Defendant claims in his brief that he did not understand the form, asserting that it was the first time that he had been arrested and charged with a serious crime. However, Defendant had previous arrests for two counts of reckless endangerment and one count of theft, and he served a sentence on one of the reckless endangerment charges. Therefore, Defendant had familiarity with the criminal justice system. Defendant admitted that Detective Carlton read the waiver of rights form to him, and he specifically advised Defendant, "[y]ou have the right to talk to your lawyer for advice before we ask you any questions and to have him with you during questioning." Detective Carlton further advised Defendant, "[i[f you decide to answer any questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to your lawyer." As pointed out by the State, this explanation by Detective Carlton could not have been more explicit, and Defendant made a knowing and voluntary waiver of his right to counsel as found by the trial court.

After Detective Carlton read Defendant's *Miranda* rights to him, the following exchange took place:

[Defendant]: Yeah I got a lawyer too so . . .

[Detective Carlton]: Okay. If you understand what all that means, you can just sign right there.

[Defendant]: So how would that work, if I – since I gotten a lawyer. 'Cause I – I was supposed to talk to him as soon as I got back but ya'll came first so?

[Detective Carlton]: Uh, it – it – it works however you want it to work. I'm here to, uh – willing to talk to you, answer any questions you got, um . . .

((Crosstalk))

[Detective Carlton]: Do what?

[Defendant]: What I'm charged with?

[Detective Carlton]: You said you wanna know?

[Defendant]: Yeah.

[Detective Carlton]: Um, especially aggravated robbery, two counts of aggravated robbery. . .

[Defendant]: Two counts mean like it's a serious charge or it's like t-twice, like – I don't know what that means. Somebody told me it was like – it would be two different things, like.

[Detective Carlton]: . . .and then one count of especially aggravated burglary, uh, basically each – each charge is for a different person, okay?

The recording of the interview reflects that Detective Carlton told Defendant, "like I said, I'm willing to talk to you and answer any questions, we'll go into, we'll go into detail on why these charges, you say you have an attorney, do you want to continue asking me questions? And I'll answer them for you." Defendant responded: "No, that's what I wanted to know." Detective Carlton did not say anything else, and Defendant immediately began discussing his arrest in Utah for the present offenses. He also asked Detective Carlton why police surrounded his mother's house after Defendant had been arrested and the status of his co-defendants. Detective Carlton then answered Defendant's questions, and Defendant began discussing the events related to the home invasion.

In this case, as argued by the State, Defendant voluntarily re-initiated his conversation with Detective Carlton after telling Detective Carlton that he had an attorney. He does not allege that Detective Carlton coerced him into re-initiating the conversation, and the video of the interview shows that Detective Carlton did not say anything before Defendant began asking questions about his case and voluntarily made the statement at issue. *State v. Davis*, 141 S.W.3d 600, 627 (2004). Defendant is not entitled to relief on this issue.

- 13 -

### III.    Sentencing

Defendant contends that the trial court erred by using an element of the crime of especially aggravated robbery to enhance his sentence for that offense. We disagree.

Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401 (2017), *Sentencing Comm'n Cmts*. In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2017).

Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Defendant only challenges his sentence for especially aggravated robbery, and we conclude that the trial court properly sentenced Defendant for that conviction. Defendant's conviction for especially aggravated robbery is a Class A felony. T.C.A. § 39-13-403(b). As a Range I offender, Defendant was subject to a sentencing range of fifteen to twenty-five years. T.C.A. § 40-35-111(b)(1); § 40-35-112(a)(1). Defendant's sentence of eighteen years is within the range.

The record reflects that the trial court considered two statutory enhancement factors in determining Defendant's sentences: (8), that Defendant had previously failed to comply with sentences involving release into the community; and (10), that Defendant had no hesitation about committing a crime when the risk to human life was high. T.C.A. § 40-35-114(8) and (10). The trial court also found one mitigating factor: (6) that as a result of Defendant's age he lacked substantial judgment in committing the offense. T.C.A. § 40-35-113(8).

Defendant does not challenge the application of enhancement factor (8), and the record reflects that it was appropriately applied. The record reflects that Defendant violated his probation in a previous case several times, and he failed to comply with the conditions of his release by testing positive for marijuana numerous times. Defendant also failed to enroll in and/or complete an alcohol and drug treatment program, and he failed to pay his court costs. Additionally, after making bond in this case, Defendant was charged with two separate theft offenses, and he hid to avoid arrest. As pointed out by the State, the application of a single enhancement factor can justify an enhanced sentence. *State v. Bolling*, 75 S.W3d 418, 421 (Tenn. Crim. App. 2001). Therefore, the application of factor (8) alone justifies Defendant's eighteen-year sentence for especially aggravated robbery.

Relevant to enhancement factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high, the trial court found:

> I recall from the trial of this case that we had a group of four young men that decide to invade a home, use a weapon, [a]ffect a robbery that results in a discharge of the firearm and somebody receiving a permanent injury as a result of the discharge of that firearm.
>
> One of the problems that exists in our community deals with firearms. There's an absolute fixation about having a handgun and using a handgun, and it's just by the absolute grace of [G]od that there weren't people that lost their lives as a result of this.

The trial court further said: "It's particularly distressing when you think about the fact that there were children in the home of this event," and "any time that you're with a group of people that have a handgun, the risk to human life becomes high and in this instance, we - - it's clear."

Defendant argues that factor (10) does not apply in his case because violence and injury with a weapon is an essential element of especially aggravated robbery. He further contends that the trial court "did not find that any other people at the residence were directly affected by the gunshot of Mr. Brown, so the enhancer should not apply." We find that the record supports the trial court's application of this factor. In a case, such as

- 15 -

this, where a risk to human life is inherent in the underlying conviction, enhancement factor (10) only applies if a defendant's actions posed a high risk to the life of a person other than the named victim. *See State v. Reid,* 91 S.W.3d 247, 312 (Tenn. 2002); *State v. Imfeld*, 70 S.W.3d 698, 707 (Tenn. 2002); *State v. Zonge*, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). In the present case, contrary to Defendant's claim that the trial court did not find anyone else was directly affected by Mr. Brown's shooting, trial court stated that "any time you're with a group of people that have a handgun, the risk to human life becomes high and in this instance, we - - it's clear." The trial court noted that there were also children in the home at the time of the shooting, and "it's just by the absolute grace of [G]od that there weren't people that lost their lives as a result of this."

We conclude that the trial court properly sentenced Defendant. The trial court considered the relevant principles and sentenced Defendant to a within-range sentence for his especially aggravated robbery conviction. As such, Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing, we reverse Defendant's conviction for aggravated robbery in Count Five and dismiss that charge with prejudice. We affirm his remaining convictions for aggravated burglary, possession of a firearm during the commission of a dangerous felony, especially aggravated robbery (Count Three), and one count of aggravated robbery (Count Four).

_____
THOMAS T. WOODALL, JUDGE